AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A SILVER 2010 TOYOTA CAMRY BEARING NEW MEXICO LICENSE PLATE NKG314 AND VIN 4T4BF3EK1AR057497

Case No. **23mr1493**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See attachment A

located in the _____ District of **New Mexico**, there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1153 | Offenses Committed in Indian Country |
| 18 U.S.C. § 113(a)(6) | Assault Resulting in Serious Bodily Injury |

The application is based on these facts:
See attached affidavit

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Samantha Vona, FBI Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephonically sworn and electronically signed *(specify reliable electronic means)*.

Date: 08/07/2023

_____
Judge's signature

City and state: Albuquerque, New Mexico    Jennifer M. Rozzoni, United States Magistrate Judge
_____
Printed name and title

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>A SILVER 2010 TOYOTA CAMRY<br>BEARING NEW MEXICO LICENSE PLATE<br>NKG314 AND VIN 4T4BF3EK1AR057497 | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF

## AN APPLICATION FOR A SEARCH WARRANT

I, Samantha Vona, Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, having been duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search of property – a silver 2010 Toyota Camry bearing New Mexico license plate NKG314 and Vehicle Identification Number ("VIN") 4T4BF3EK1AR057497, hereinafter "SILVER CAMRY", described further in Attachment A for evidence, instrumentalities, and contraband described further in Attachment B, concerning violations of 18 U.S.C. § 1153 and 113(a)(6), that being Offenses committed within Indian Country and Assault Resulting in Serious Bodily Injury.

2. I have been a Special Agent with the FBI and have been employed with the FBI since January 2020. I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia. I am assigned to the Sacramento Division, Bakersfield Resident Agency. I am currently on Temporary Duty Assignment ("TDY") to the Albuquerque Field Office to work Indian Country Investigations.

3. I have previously completed a TDY to Tulsa, Oklahoma where I investigated Indian Country

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

crimes, such as, child sexual assault, child abuse, and rape. I also have experience investigating drug, gang and firearm cases as a member of the Safe Streets Task Force and white collar, public corruption and violent crimes against children. My investigative experience includes conducting interviews and surveillance, executing search and arrest warrants and working on joint investigations and operations with law enforcement officers from other state and federal agencies.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1153 and 113(a)(6), that being Offenses Committed within Indian Country and Assault Resulting in Serios Bodily Injury, have been committed by JACQUELYN MOORE, Year of Birth ("YOB") 1976, a member of Navajo Nation. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

5. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of and for the items described in Attachments A and B for evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

in this Affidavit are summaries in substance and in part. The following is true to the best of my knowledge and belief.

FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

6. On July 18, 2023, Navajo Nation Police Department ("NNPD") Officers and Navajo Criminal Investigators ("CI") responded to the parking lot of the To'hajiilee Chapter House, which is located within the exterior boundaries of the Navajo Nation, after MOORE drove her SILVER CAMRY into D. F., YOB 1959, a member of the Navajo Nation, hereinafter "Jane Doe". Jane Doe was transported to the University of New Mexico Hospital ("UNMH") with a severely severed leg that had to be amputated. MOORE was arrested and taken into custody by NNPD. As indicated by NNPD, MOORE refused a breathalyzer test.

7. On July 19, 2023, Jane Doe was interviewed by a Navajo CI. Jane Doe informed that on July 18, 2023, Jane Doe went to the To'hajiilee Chapter House to meet her husband, who was attending the meeting. Jane Doe was outside of the Chapter House with other women, three of which stood against the building due to the heat. Jane Doe saw a white colored, older model car drive toward them. Jane Doe thought the vehicle was going to stop, but the vehicle drove over the cement wheel stop. Some of the women were able to move out of the way but Jane Doe was not fast enough. Jane Doe tried to move and the car hit her, pinning her against the wall. Jane Doe yelled for help because she was not able to move. Jane Doe's husband went to the driver, threw the driver on the ground, put the vehicle in reverse, and moved the vehicle away from Jane Doe. Jane Doe turned to her right and fell.

8. Jane Doe did not realize she lost her leg. she felt numb and hot. Bystanders poured water on her and tried to provide shade. A bystander told Jane Doe that she lost her leg and provided instructions on how to apply a belt to use as a tourniquet. Jane Doe thought she was going to die because of the amount of blood she lost. Upon arriving at the UNMH the "surgeon team"

took Jane Doe into surgery and told her that her leg was amputated.

9. Jane Doe described the driver as female, thin build wearing a white shirt and a cap. Jane Doe thought the driver looked drunk. The driver was a mess and was dirty. Jane Doe did not know the driver's name but knew her mother and her sister.

10. On July 19, 2023, MOORE was interviewed by a Navajo CI. MOORE was advised of her Miranda Rights and MOORE said she understood. Jane Doe worked with MOORE's mother. There were no grudges between MOORE and Jane Doe or their families. MOORE did not know what happened because she was intoxicated. MOORE drove a Toyota Camry. MOORE remembers being at the Chapter House area but did not remember where she was coming from or where she was going. MOORE remembered seeing police officers and remembered being arrested. MOORE did not remember what happened because she blacked out.

11. A Navajo CI interviewed witnesses whose statements put MOORE at the Chapter House as the driver of the SILVER CAMRY. E.A., YOB 1960, hereinafter Witness 1, was talking to Jane Doe when she turned and saw a car coming towards them. The car was going slow, but then sped up towards them and went over the curb. Witness 1 was able to move out of the way and saw the vehicle hit Jane Doe somewhere in the left knee area. When the vehicle moved, Jane Doe fell, her leg hanging loose, only held together by skin and ligaments. Witness 1 saw the female driver trying to get out of the vehicle. Jane Doe's husband and Witness 1 put the driver on the ground. The female driver looked intoxicated or like she was on drugs. The driver stated I'm going to get all your people, like she was going to kill them. Witness 1 heard that the driver was the sister of the Chapter House's secretary.

12. J.C. YOB 1954, hereinafter Witness 2, was standing with Jane Doe, when she saw the vehicle enter the parking lot and heard the engine rev up. Witness 2 was standing on a concrete bar but stepped off. That is when the vehicle top area slightly hit Witness 2's arm and pushed her to

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

the right. Witness 2 turned around and saw the car hit Jane Doe into the wall. Jane Doe was facing the car. The car stopped but did not reverse. All the windows in the car were down and Witness 2 recognized the driver of the car as Jaquelyn Secatero[1]. The driver opened the door, and someone yelled to not let her leave. Witness 1 grabbed the door and pushed the driver against it. The driver was laughing and pushed back but was thrown to the ground. The driver stated she was just a passenger but there was no one else inside the vehicle.

13. J.C.S., YOB 1968, hereinafter Witness 3, saw a grey four-door vehicle approach the group of women including her and Jane Doe. She thought the vehicle was going to park in an empty spot. The vehicle was going at a slow pace, then suddenly, the engine revved, and the vehicle sped up. The vehicle came directly at them, jumping the cement block, coming towards Jane Doe. The vehicle hit Jane Doe and both of them were pinned but Witness 3 was not caught as much as Jane Doe. Jane Doe started screaming for her husband and everyone ran to her aide. Witness 3 recognized Jacquelyn Secatero in the vehicle. Secatero was MOORE's maiden name. MOORE attempted to get out of the vehicle. People were yelling don't let her get away and then MOORE was on the ground, saying crazy things. MOORE looked drunk and like she was high. MOORE's eyes were glossy, and she was out of it. MOORE was on the driver side and there was no one else in the grey sedan.

14. On July 20, 2023, a Navajo CI located the SILVER CAMRY at the Madrid Towing Service, 3310 San Ygnacio Road Southwest, Albuquerque, New Mexico. The Navajo CI placed red color evidence tape on all four doors, the trunk and the hood.

**TERMINOLOGY**

**TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS**

---

[1] It should be noted that record checks for MOORE revealed that MOORE has also gone by the name Jacquelyn Secatero.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

**INFOTAINMENT AND TELEMATICS SYSTEMS (CCIPS 2020)**

15. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

16. Many modern motor vehicles are equipped with sensors, cameras[2], transmitters, and electronic control units (ECUs) to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.

17. "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

18. The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in

---

[2] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

19. These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

20. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

21. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

22. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed, or brakes were engaged.

23. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

24. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

25. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

26. To complete a forensic extraction from the Vehicle, it may be necessary, temporarily, to remove trim and other components of the Vehicle to access the information subject to search.

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the Vehicle. In the event that potentially destructive processes are required to perform this extraction, parts of the Vehicle may be destroyed and rendered useless.

27. Furthermore, it may be necessary to return to the Vehicle and reconnect the infotainment and telematics systems to the Vehicle's power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

28. The requested warrant authorizes a later review of the media and information seized or copied from the Vehicle, which review may continue past the date required for execution of the warrant.

29. On July 20, 2023, CI James located the SILVER CAMRY at the Madrid Towing Service, 3310 San Ygnacio Road SW, Albuquerque, New Mexico. CI James place red color evidence tape on all four doors, the trunk and the hood.

## SUBJECT VEHICLE

30. The SILVER CAMRY may be described as a 2010 Silver Toyota Camry bearing New Mexico License Plate NKG314 and VIN Number 4T4BF3EK1AR057497. The SILVER CAMRY is currently secured at Madrid Towing Service, 3310 San Ygnacio Road Southwest, Albuquerque, New Mexico. A return on the vehicle's license plate confirmed that the SILVER CAMRY was registered to MOORE but expired April of 2023.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### CONCLUSION

31. Based on the above information, I submit there is probable cause to search the SILVER CAMY described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and instrumentalities of, or property designated for use, intended for use, or used in committing violations of 18 U.S.C. § 1153 and 113(a)(6), that being Offenses Committed within Indian Country and Assault Resulting in Serious Bodily Injury.

32. This affidavit was reviewed and approved by Supervisory Assistant United States Attorney Elisa Dimas.

Respectfully Submitted,

Samantha Vona
Special Agent
Federal Bureau of Investigation

ELECTRONICALLY SUBMITTED AND TELEPHONICALLY SWORN BEFORE ME ON AUGUST 7, 2023.

JENNIFER M. ROZZONI
United States Magistrate Judge
District of New Mexico

## ATTACHMENT A
PREMISIS TO BE SEARCHED

Subject Vehicle to be searched is a silver 2010 Toyota Camry bearing New Mexico license plate NKG314 and Vehicle Identification Number (VIN) 4T4BF3EK1AR057497, currently located at Madrid Towing, 3310 San Ygnacio Road SW, Albuquerque, New Mexico. A color photograph is posted below.



**ATTACHMENT B**
PROPERTY TO BE SEIZED BY THE GOVERNMENT

The items, information, and data to be seized from the locations described in Attachment A are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1153 and 113(a)(6), that being - Offenses Committed within Indian Country and Assault Resulting in Serious Bodily Injury, as described in the search warrant affidavit, including:

1. Collection of any electronic mobile devices such as cellular telephones, tablets, and/or other electronic devices located within the vehicle.

2. Any evidence of controlled substance, to include marijuana, controlled substance analogue, or listed chemical or paraphernalia for the use or abuse of drugs or controlled substances.

3. Evidence of alcoholic drinks and/or containers.

4. Any paperwork indicative of ownership, such as, vehicle insurance, registration and/or title.

5. Any fibers, and/or Deoxyribonucleic Acid ("DNA"), such as, hair, blood, tissue and/or other bodily fluids.

6. Any electronic information recorded by the vehicle as defined by the above terminology, to include, vehicle speed, accelerator rate, engine RPM, seat belt information, shift position, seat position, airbag deployment and/or crash force.